NO. 07-06-0454-CV



IN THE COURT OF APPEALS



FOR THE SEVENTH DISTRICT OF TEXAS



AT AMARILLO



PANEL C



MAY 31, 2007



______________________________




STANTON CLARK PACKARD, M.D., APPELLANT



V.



MAURICE ROBERT MILLER, JR., APPELLEE




_________________________________



FROM THE 69TH DISTRICT COURT OF MOORE COUNTY;



NO. 04-81; HONORABLE RON ENNS, JUDGE



_______________________________



Before QUINN, C.J., and HANCOCK and PIRTLE, JJ.





MEMORANDUM OPINION ON REHEARING






 Remaining convinced that our original disposition is correct, we overrule Appellee's
motion for rehearing, but withdraw our original opinion and judgment, and substitute this
opinion in lieu thereof with additional comments.

 Appellant, Stanton Clark Packard, M.D., brings this appeal from an order denying
a motion to dismiss filed pursuant to § 74.351 of the Texas Civil Practices and Remedies
Code. (1) Section 74.351(a) mandates that, in a health care liability claim, the claimant shall
serve each party or the party's attorney with an expert report, with curriculum vitae
attached, not later than the 120th day after the date the claim is filed. Section 74.351(b)
provides that if that report has not been served within the requisite period of time, the trial
court shall dismiss the claim. In this case Appellee, Maurice Robert Miller, Jr., was unable
to serve the expert report until the 130th day after the date of filing because he was unable
to obtain service of process until that date. The issue presented by this appeal is whether
the trial court erred in denying Dr. Packard's motion to dismiss based upon the failure to
serve the expert report within the statutory 120 day period, when Dr. Packard was not
served with service of process during that period. Finding error, we reverse and remand
for further proceedings.

Background Facts


 In August 2002, Miller went to the emergency room at the Moore County Hospital
complaining of mid and upper chest pain. Three days later he was admitted to the hospital
for treatment of a myocardial infarction. On November 8, 2004, Miller filed suit contending
that his heart was damaged by the failure of Dr. Packard to properly diagnose his heart
condition. Miller was unable to effectuate formal service of process on Dr. Packard until
March 18, 2005, the 130th day after the original date of filing suit. (2) The expert report was
attached to the petition when it was served.

 Based on the fact that Miller did not serve his expert report on Dr. Packard within
120 days after the date of filing his claim, Dr. Packard moved to dismiss Miller's health care
liability claim pursuant to § 74.351(b). The trial court denied Dr. Packard's motion to
dismiss, and this appeal ensued.

Interlocutory Appeal


 As a general rule, a party is not allowed to appeal an interlocutory order unless
specifically authorized by statute. (3) Section 51.014(a)(9) provides that a person may appeal
an interlocutory order that denies all or part of the relief sought by a motion under §
74.351(b). Because Dr. Packard's motion was filed pursuant to that statute, he is
authorized to bring this appeal notwithstanding the fact that the order in question is
interlocutory.

Section 74.351


 Miller's claim against Dr. Packard is a health care liability claim governed by chapter
74 of the Code. Section 74.351(a) provides that a claimant in a health care liability claim
shall, not later than the 120th day after the date the claim was filed, serve on each party or
the party's attorney one or more expert reports, with a curriculum vitae attached. This
deadline for serving the report may be extended by written agreement of the parties; (4)
however, there was no such agreement in this case. Furthermore, in situations where a
report has been filed but the elements of that report have been found to be deficient, the
court may grant one 30-day extension to the claimant in order to cure the deficiency. (5) This
exception to the general rule is likewise not applicable to the facts of this case because it
applies only in those situations where an initial report has been timely served, but has been
found to be deficient in some material fashion. (6) Other than the two statutory exceptions
set forth above, the trial court has no authority to extend the deadline for filing an expert
report. (7)

Standard of Review


 The trial court's ruling on a motion to dismiss pursuant to § 74.351(b) is reviewed
under an abuse of discretion standard. (8) A trial court abuses its discretion if it acts in an
unreasonable and arbitrary manner such that the exercise of that discretion amounts to a
"clear and prejudicial error of law." (9)

Analysis


 Miller argues that the trial court's denial of Dr. Packard's motion to dismiss was
based upon an implied equitable extension of the time to file the expert report. Miller
contends that the equitable extension was based upon a construction of Rule 21a of the
Texas Rules of Civil Procedure which allows the trial court to "extend the time for taking
the action required . . . or grant such other relief as it deems just." This provision
specifically pertains to a party's right to seek redress from the consequences of what is
commonly referred to as the "mailbox rule" and has no application to the facts of this case. 
Furthermore, because the Legislature has provided the exclusive means by which a trial
court may grant an extension of time to file an expert report, Rule 21a does not give the
trial court authority to enter an order extending the time to file an expert report.

 Miller next argues that the trial court had the discretion to refuse to dismiss the suit
because the failure to timely serve the expert report was due to Dr. Packard's failure to
make himself readily amenable to service of process, and that by "avoiding" service of
process, a health care provider might prevent an otherwise-entitled claimant from making
a legitimate health care liability claim. While the equities of this argument are apparent to
this Court, it is not within the province of this Court, or the trial court, to adopt an "equitable
extension" to the clear requirements of § 74.351. 

 Finally, because Dr. Packard waited almost eighteen months to file his motion to
dismiss, Miller opines that Dr. Packard should be equitably estopped from asserting his
right to file a motion to dismiss pursuant to § 74.351. The Legislature did not include an
explicit deadline for the filing of a motion to dismiss. Miller's equitable arguments are more
appropriately directed to the reasonableness of any attorney's fees which Dr. Packard may
claim to be entitled to under the provisions of § 74.351(b).

 As stated above, the Legislature has provided two specific exceptions to the
mandatory dismissal provisions of § 74.351(b). (10) To engraft an exception based upon
Appellant's arguments would amount to blatant legislating from the bench. The Legislature
has spoken and the seemingly harshness of this provision does not change the clear
language of the statute. (11)

Conclusion


 Because the trial court did not have the authority to extend the time to file the
required expert report, it failed to follow clear precedential authority in the interpretation and
application of § 74.351(b). Accordingly, it abused its discretion in denying Dr. Packard's
motion to dismiss. We sustain Dr. Packard's issue and reverse the order of the trial court
denying the motion to dismiss. This cause is remanded to the trial court with instructions
to enter an order of dismissal of Miller's claims against Dr. Packard, with prejudice, and for
such further proceedings and orders as the parties may show themselves justly entitled to
receive in accordance with this opinion.


 Patrick A. Pirtle

 Justice

1. Unless otherwise noted, all statutory references herein are to the Texas Civil
Practice & Remedies Code Annotated (Vernon 2005 & Supp. 2006). 
2. Miller filed suit on November 8, 2004, under the version of § 74.351 that was
effective for claims filed on or after September 1, 2003. See Act of June 2, 2003, 78th
Leg., R.S., ch. 204, §§ 10.01, 10.09, 23.02(a), (d), 2003 Tex. Gen. Laws 847, 864, 875,
884, 898-99. The Texas Legislature amended § 74.351 in 2005; however, the 2005
changes apply "only to a cause of action that accrues on or after the effective date of this
Act. An action that accrued before the effective date of this Act is governed by the law
applicable to the action immediately before the effective date of this Act, and the law is
continued in effect for that purpose." Act of May 18, 2005, 79th Leg., ch. 635, § 2, 2005
Tex. Gen. Laws 1590. Because the 2003 version of § 74.351 applies to this case, all
references to § 74.351 herein are to the 2003 version.
3. Lehmann v. Har-Con Corp., 39 S.W. 3d 191, 195 (Tex. 2001).
4. Section 74.351(a).
5. Section 74.351(c).
6. See Estate of Regis ex rel. McWashington v. Harris Co. Hosp. Dist., 208 S.W.3d
64, 67 (Tex.App.-Houston [14th Dist.] 2006, no pet.); Valley Baptist Med. Ctr. v. Azua, 198
S.W.3d 810, 815 (Tex.App.-Corpus Christi 2006, no pet.).
7. Tex. Civ. Prac. & Rem. Code Ann. § 74.351(a) (c); See also Soberon v. Robinson,
No. 09-06-0067-CV, 2006 WL 1781623 (Tex.App.-Beaumont June 29, 2006, pet.
denied)(not designated for publication); McWashington, 208 S.W.3d at 68; Thoyakulathu
v. Brennan, 192 S.W.3d 849, 853 (Tex.App.-Texarkana, 2006, no pet.); Garcia v.
Marichalar, 185 S.W.3d 70, 74 (Tex.App.-San Antonio 2005, no pet.).
8. Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios, 46 S.W.3d 873, 875 (Tex.
2001).
9. In re Bass, 113 S.W.3d 735, 738 (Tex. 2003); quoting Walker v. Packer, 827
S.W.2d 833, 839 (Tex.1992) (original proceeding).
10. See footnote No. 7.
11. See Turner v. Cross, 83 Tex. 218, 18 S.W. 578, 579 (1892) (holding, "It is the duty
of a court to give to language used in a statute the meaning with which it was used by the
legislature if this can be ascertained; . . . and if, so applying them, the legislation in which
they are found seems to be harsh, or not to embrace and give remedies for acts for which
remedies ought to be given, the courts, . . . are not authorized to place on them a forced
construction for the purpose of mitigating a seeming hardship, . . . . It is the duty of a court
to administer the law as it is written, and not to make the law; and however harsh a statute
may seem to be, or whatever may seem to be its omission, courts cannot, on such
considerations, by construction sustain its operation, or make it apply to cases which it
does not apply, without assuming functions that pertain solely to the legislative department
of the government.")


hnique on
the occasion in question. Id.

 The Kelly court summarized its determination as follows:

 To summarize, under Rule 702 the proponent of novel
scientific evidence must prove to the trial court, by
clear and convincing evidence and outside the presence of
the jury, that the proffered evidence is relevant. If
the trial court is so persuaded, then the evidence should
be admitted for the jury's consideration, unless the
trial court determines that the probative value of the
evidence is outweighed by some factor identified in Rule
403. (Emphasis added.)


When the admission of such evidence is challenged on appeal, the
question is whether the trial court abused its discretion by
admitting the evidence.

 In the case before us, appellant does not challenge the
admissibility of the DNA testing, nor does he attack two of the
three statistics generated from the test results. We note that in
Kelly, the Court of Criminal Appeals addressed for the first time
whether RFLP (restriction fragment length polymorphism) DNA testing
was admissible in a criminal trial. Applying the newly announced
rule, the Court concluded such testing was admissible. Id. at
574.

 In this instance, appellant challenges the probability of
paternity statistic calculated from the DNA test results. We
conclude that the probability of paternity statistic meets the
Kelly admissibility requirements and that the trial court did not
abuse its discretion in admitting the challenged evidence.

 The trial court conducted a hearing outside the presence of
the jury to determine the admissibility of the State's DNA
evidence. The State's expert, Dr. Arthur J. Eisenberg, testified 
about the DNA evidence generally and the probability of paternity
statistic in particular. Dr. Eisenberg has a Bachelor's of Science
in Biology, a Master's of Science in molecular biology, and a Ph.D.
in molecular biology. He listed a number of organizations he
belongs to involved in DNA testing or research including the
American Association of Blood Banks, the U.S. DNA Advisory Board,
and the Parentage Testing Committee. Further, he testified that he
had been involved in the field of DNA testing since its inception. 
Eisenberg set up and manages the DNA laboratory at the University
of North Texas at Fort Worth where the testing in this case was
performed.

 Eisenberg testified that in this case he conducted a paternity
test on five males, T.S., and the baby. Appellant was one of those
five, and he was the only one not excluded from paternity by the
DNA testing. Eisenberg stated unequivocally that the methodologies
used for statistical analysis of the test results were "standard
methods" employed in over 200,000 parentage tests performed
nationwide annually.

 Eisenberg explained each of the three statistics in turn. The
probability of paternity was calculated by using Bayes' Theorem. 
Bayes' Theorem, according to Eisenberg, states that prior to the
testing, there is a prior probability of paternity. He stated that
courts in the United States typically use a .5 or 50% prior
probability because it is a neutral probability. The .5 prior
probability indicates that the tested male either is or is not the
father. Eisenberg further testified that this calculation was a
generally accepted principle, and was standard methodology in
parentage testing, having been used for twenty or thirty years. (2)

 Eisenberg further explained the theory and methodology
involved in DNA testing generally. After explaining how DNA
functions and how the tests are conducted, he discussed the
specific results in this case. Eisenberg stated that using the .5
prior probability, which was the standard prior probability
reported in parentage tests, that appellant's probability of
paternity was 99.99%. At this point, the State passed Eisenberg as
a witness, and defense counsel cross-examined him.

 On cross, Eisenberg reiterated that the prior probability of
.5 was a neutral prior probability which did not presume appellant
was guilty of the crime or more likely than not guilty. He
emphasized that he had personally testified in both civil and
criminal paternity matters using the same statistic invoking a .5
prior probability. Eisenberg stated that he had testified in over
a dozen Texas criminal cases involving paternity issues where he
used the .5 prior probability.

 Most notably, Dr. Eisenberg was asked point blank whether he
saw any problem using the .5 prior probability in a criminal case,
even assuming the defendant as presumed to be innocent. 
Eisenberg's answer, twice, was "[a]bsolutely not." He testified
that the .5 prior probability did not unfairly skew the probability
of paternity statistic. Moreover, Eisenberg stated that if a lower
prior probability number had been used, like .1, then the
probability of paternity statistic would have been lower, though it
would still be representative of the fact that the appellant had
matched at six genetic test sites. (3) According to Eisenberg, if a
prior probability that reflected true parentage testing had been
used, it would have been something higher than .5 and the
probability of paternity would have been even higher than 99.99%.

 Based on Dr. Eisenberg's testimony, the trial court was
required to determine whether the State had shown by clear and
convincing evidence that the probability of paternity statistic
would be helpful to the trier of fact and that it was sufficiently
reliable and relevant to help the jury in reaching accurate
results. Looking to the factors outlined in Kelly, we note that
Eisenberg testified that hundreds of thousands of DNA tests, and
millions of HLA and DNA tests around the nation reported paternity
results using Bayes' Theorem and the probability of paternity
invoking a .5 prior probability. These tests were conducted by
accredited testing facilities, and the statistical calculation was
"standard."

 Eisenberg testified about his qualifications in DNA paternity
testing and reported that he was involved in the field from its
inception. He testified that the statistical calculation was
employed for twenty to thirty years in paternity tests based on HLA
blood typing and later DNA analysis. Eisenberg commented that
there were over fifty other laboratories in the country using the
same techniques and reporting the same statistics. He also stated
that the calculations employed in this particular test were the
"standard" method of reporting paternity results around the
country. Finally, he testified about the techniques involved in
DNA testing, his qualifications in conducting those tests, and his
experience in reporting statistics, which were "co-related" to the
DNA testing.

 Based on Eisenberg's testimony, the trial court clearly
recognized that the Bayes' Theorem calculation was commonly used in
reporting DNA paternity results. Moreover, it is clear that the
probability of paternity statistic is accepted in the scientific
community of molecular biology in reporting paternity results. 
Eisenberg stated that he used the same calculation used in
thousands of other tests, indicating that he properly invoked the
reporting method. Likewise, there was no challenge that he did the
math improperly. We conclude that this evidence was clear and
convincing in showing that the probability of paternity statistic
was valid, the technique applying the statistic was valid, and that
it was properly applied in this case. Thus, the trial court
properly concluded that the statistic was reliable and relevant to
helping the jury reach accurate results.

 As to the second prong of the Kelly test, there was no
challenge to the evidence as being time consuming, cumulative,
confusing or misleading, or otherwise more prejudicial than
probative. The only challenge raised by appellant was his 
assertion that the statistic violates the presumption of innocence. 

The Presumption of Innocence


 The presumption of innocence does not appear in the U.S. or
the Texas Constitutions. However, courts have recognized that the
presumption of innocence is part of the 14th Amendment Due Process
and 6th Amendment right to fair trial. Randle v. State, 826 S.W.2d
943, 945 n. 3 (Tex.Cr.App. 1992); Rogers v. State, 846 S.W.2d 883,
885 (Tex.App.--Beaumont 1993, no pet.). Also, the Legislature has
codified the presumption of innocence in the Texas Penal Code and
the Code of Criminal Procedure. See Tex. Penal Code Ann. § 2.01
(Vernon 1994); Tex. Code Crim. Proc. Ann. art. 38.03 (Vernon Supp.
1998).

 It is stated that the presumption of innocence is not a true
presumption. Normally, a presumption is an assumption of fact that
the law requires to be made from another fact or group of facts
found or otherwise established in the action, which may be
rebuttable or conclusive. Black's Law Dictionary, 1185 (6th ed.
1990). A presumption acts as a burden shifting device. Id.

 By contrast, the presumption of innocence is perhaps better
phrased the "assumption of innocence." McCormick on Evidence § 342
at 579-80 4th ed. (1992). It merely describes the fact that the
burden of persuasion and production in a criminal matter are on the
prosecution. Id. It cautions the jury to reach their conclusion
solely from the evidence adduced, and not from the fact of arrest
or indictment. Id. citing 9 Wigmore Evidence § 2511 at 407
(Chadbourn rev. 1981).

 The presumption of innocence is not a true presumption because
the defendant is not required to come forward with proof of
innocence once evidence of guilt is introduced so as to avoid a
directed verdict of guilty. Black's Law Dictionary, 1186 (6th ed.
1990). Typically, cases finding violations of the presumption of
innocence involve situations where the defendant is placed before
the jury, dressed in shackles or jail clothes, or where the State
offers evidence that the defendant has been indicted in other
crimes. See Randle, 826 S.W.2d at 946; Lafayette v. State, 835
S.W.2d 131, 135 (Tex.App.--Texarkana 1992, no pet.). Clearly
neither of those situations exist here.

 In the case before us, testimony was elicited from Dr.
Eisenberg about all three statistics. Dr. Eisenberg testified on
direct about probability of paternity based on a .5 prior
probability. On cross, he testified about how the probability
number would change based on different prior probability values. 
We conclude that the use of a probability of paternity statistic
based on Bayes' Theorem in a criminal proceeding does not violate
the presumption of innocence. The use of a prior probability of
.5 is a neutral assumption. The statistic merely reflects the
application of a scientifically accepted mathematical theorem which
in turn is an expression of the expert's opinion testimony. It is
subject to the same conditions applied to all other expert
testimony. The jury is free to disregard it. It can be weakened
on cross and in argument. The statistic does nothing to shift the
burden of persuasion or production in a criminal matter. 

 Appellant asserts that his specific challenge is a matter of
first impression in Texas criminal cases. Consequently, he relies
on two cases from other jurisdictions where the courts exclude the
probability of paternity calculation as a violation of the
presumption of innocence. While we do find cases that have
admitted DNA testing and the probability of paternity statistic, we
have found no Texas criminal case in which the presumption of
innocence challenge was made or addressed. (4)

 The two primary cases the appellant relies on to support this
alleged violation of the presumption of innocence challenges are
State v. Hartman, 426 N.W.2d 320 (Wis. 1988) and State v. Skipper,
637 A.2d 1101 (Conn. 1994). The rationale in Hartman and Skipper
is that the probability of paternity statistic violates the
presumption of innocence because it assumes that the putative
father had sexual intercourse with the mother; stated another way,
it assumes the crime was committed by him in order to prove that
the crime was committed by him. Hartman, 426 N.W.2d at 326;
Skipper, 637 A.2d at 1106 (citing Hartman). Both of these cases
come to this conclusion, at least in part, by relying on Peterson,
A Few Things You Should Know About Paternity Tests (But Were Afraid
To Ask), 22 Santa Clara L.Rev. 667 (1982).

 Additionally, the Hartman court bases its conclusion on a
single statement it made just one month earlier in In Re Paternity
of M.J.B., 425 N.W.2d 404 (Wis. 1988). In Hartman, the court said
the assumption underlying the probability of paternity statistic
was "that the mother and the putative father have engaged in sexual
intercourse at least once during the possible conception." 
Hartman, 426 N.W.2d at 326 (quoting M.J.B., 425 N.W.2d at 409, in
turn citing Peterson, 22 Santa Clara L. Rev. at 685). For reasons
we shall explain, we do not agree that the basic assumption that
intercourse occurred is implicit in the statistic.

 Peterson's Santa Clara Law Review article seems to be at the
root of the Hartman and Skipper decisions. That article discusses
the use of blood tests in paternity cases, including HLA testing. 
HLA testing reports the same three statistics reported in DNA
testing, and in particular in the case before us. In that article,
Peterson criticizes the value of Bayes' Theorem. He states that
Bayes' Theorem accurately reflects the odds that the accused is the
father only if one assumes "that the defendant had intercourse with
the mother and that a random man . . . also had intercourse with
her." Peterson, Santa Clara L.Rev. at 685. We note that the
author of the article was himself not a statistician or geneticist,
but an attorney and professor. We further note that the author
does not cite direct authority (either legal or scientific) to
support his statement. We disagree with this conclusion. 
Logically, the prior probability assumes intercourse could have
occurred and thus the putative father could be the actual father,
but the statistic does not necessarily assume intercourse did
occur.

 As Dr. Eisenberg testified at the suppression hearing, the .5
prior probability is "a neutral prior probability" that indicates
"[e]ither [the putative father] is or is not the father." There
was no testimony from Eisenberg or Koehler, the defense expert,
indicating that the prior probability assumes intercourse
necessarily occurred. The prior assumption could invoke any number
of possible conditions or permutations, as Peterson points out,
including time of intercourse, frequency, fertility, and the like. 
However, by making the prior assumption .5 (i.e., - equally
weighted), Bayes' Theorem also allows that intercourse may not have
occurred at all.

 Hartman and Skipper rely heavily on the conclusion in
Peterson's article which we consider questionable. Moreover, it is
important to note that the Hartman court, while it quotes M.J.B. in
part, does not follow M.J.B.'s rationale. In M.J.B., the Wisconsin
Supreme Court also stated that "the probability of paternity
statistic is conditionally relevant evidence; only after competent
evidence is offered to show that sexual intercourse between the
mother and alleged father occurred during the conceptive period may
evidence of the probability of paternity statistic be received." 
In Re Paternity of M.J.B., 425 N.W.2d at 409. However, the 
Wisconsin Supreme Court further stated:


 This foundational evidence [of intercourse] may be
supplied by the mother herself . . . . However, we note
that this threshold evidence is not limited to direct
testimony by the mother that she engaged in sexual
intercourse with the alleged father. Evidence that the
defendant has access to the mother during the conceptive
period may be offered by any individual knowledgeable of
the facts of their association. By 'access' we mean that
the mother and putative father were together at a time,
under circumstances and in a location which would lead a
reasonable person to believe that the sexual intercourse
took place between them.

Id. (emphasis added). (5)

 In the case before us, there was testimony from Lubbock police
that appellant was one of the male care workers who had access to
T.S.'s dormitory. Moreover, there was evidence that appellant
worked the late night shift, from 10:00 p.m. to 6:00 a.m. Both the
police, via the restricted access dormitory log sheets, and
appellant himself, provided evidence that appellant had the
opportunity to be alone in the dorm with T.S. and other patients
during the conceptive period; that is, he had opportunity to be
with the patients without another worker present. Finally, it is
important to note that in this case before us, due to T.S.'s
impaired mental facility, there could not be any direct testimony
from her regarding who assaulted her.

 Three justices (of seven) dissented in Hartman. Justice
Steinmertz commented in his dissent on the presumption of innocence
issue. "The 50 percent prior chance assumption does not require
shifting the burden of proof to the defendant and is not an
impermissible assumption; rather, it is part of a scientific theory
and the jury should be so told." Id. at 327. He noted that the
assumption was not made in a vacuum, but was admitted only after
evidence serving as the basis for the statistic was already
admitted. Id. The probability of paternity statistic, Justice
Steinmertz reasoned, is truly neutral. It equally assumes the
defendant is not the putative father, no matter how damning the
evidence in the case. Id. at 328.

 We agree with Justice Steinmertz's evaluation of the
statistic. In the case before us, there was evidence that
appellant had access and opportunity to have intercourse with T.S. 
The DNA test itself indicated appellant was the father of the
child. Dr. Eisenberg testified in no uncertain terms that the
theory was used as the standard method of reporting paternity
tests. On cross, he testified about the effect of lower prior
probabilities on the probability of paternity. As with any other
expert testimony, the jury was free to disregard it entirely. 
Nothing about the statistic shifts the burden of persuasion to the
defendant.

 In contrast to Hartman, Skipper represents the strongest
denunciation by a court of the probability of paternity statistic
as violating the presumption of innocence. 637 A.2d 1101 (Conn.
1994). There, the defendant was convicted of second degree sexual
assault. The Connecticut Supreme Court stated "[t]he assumption
that sexual intercourse had occurred was not predicated on the
evidence in the case, but was simply an assumption made by the
expert." Id. at 1106. Since Bayes' Theorem cannot be invoked
without assuming a prior probability of paternity, the court
reasoned that its use was inconsistent with the presumption of
innocence. Id. at 1107. The Connecticut Court further reasoned
that if a value presuming innocence was entered into the equation,
the value being zero, then Bayes' Theorem would produce a 0%
probability of paternity. Id. at 1108. Beyond that fact that this
decision rests on Peterson's questionable conclusion, we simply do
not agree with the Connecticut Court's rationale.

 In this instance, five individuals were determined to have
access to T.S. during the period the child was conceived. 
Initially, there was no presumption assigned to any of these men's
paternity. Only after the men with access were tested, and all but
one excluded, was a prior probability employed. At that point,
appellant was the only actual man included, and the statistic
presumes either he or a random man could have been the father. 
Thus, the .5 prior probability accurately represents that he either
is or is not the father.

 Moreover, the presumption of innocence cannot require us to
enter a prior probability of zero into Bayes' Theorem as suggested
by the Connecticut Court. A zero prior probability does not simply
presume a defendant is innocent. Rather, a zero probability, in
fact presumes that it was impossible for the defendant to be the
father. (6) When a zero prior probability is plugged into Bayes'
Theorem (the formula), naturally the probability of paternity
results becomes 0%. The presumption of innocence does not require
a jury to assume it was impossible for a defendant to commit the
crime charged. Rather, it requires the jury to assume as a
starting proposition that the defendant did not commit the crime,
until proven otherwise. The probability of paternity, as Dr.
Eisenberg testified, is merely a way of expressing and interpreting
the actual DNA test results. Thus, the statistic itself does
nothing to shift the burden of going ahead to the defendant.

 Finally, appellant cites a third case, State v. Spann, 617
A.2d 247 (N.J. 1993). There the New Jersey Supreme Court held that
where the clear impression was given to the jury that the 50% prior
probability was a scientific assumption, the admission of the
probability of paternity statistic was reversible error. (7) Id. at
253. In Spann, there was no explanation to the jury about how the
evidence in the case might affect the prior probability, and how
that would in turn affect the probability of paternity statistic. 
The court reasoned that a jury should use its own estimate of the
prior probability of paternity, and not rely on the expert's
assumption of the defendant's access to the woman. Id. at 254.

 We note that the New Jersey Court did not conclude that the
probability of paternity statistic violated the presumption of
innocence. In fact, the court discussed a number of issues to help
guide attorneys and courts in deciding whether the statistic would
be admissible in any given case. Id. at 257-60. The court
referred to concepts of general acceptance, reliability, and
usefulness for the jury. Id. at 258. Ultimately, for future
cases, the New Jersey Court left the determination of admissibility
of the probability of paternity statistic to the trial court,
implying that they found no interference with the presumption of
innocence. Moreover, the Spann Court expressly rejected the
suggestion that the Wisconsin Supreme Court arrived at in M.J.B.,
i.e., that intercourse must be proven before the probability of
paternity statistic can be admitted. Id. at 261. The New Jersey
Supreme Court stated that "[t]he calculation - Bayes' Theorem - if
valid, does not depend on any particular degree of confidence in
the fact of intercourse." Id.

 The presumption of innocence places the burden on the State to
move forward and prove that the defendant committed all the
elements of the crime beyond a reasonable doubt. In a sexual
assault case, one element the State must show is that the defendant
caused "the penetration of the . . . female sexual organ . . ." of
the victim. Tex. Penal Code Ann. § 22.011(a)(1)(A)(Vernon Supp.
1998). While it is true that the probability of paternity
statistic presumes that the defendant could have had intercourse
with the mother of the child, it does not assume that he did have
intercourse. As Dr. Eisenberg testified, a prior probability of .5 
assumes that the defendant is just as not likely the father of the
child as it assumes he is the father. Moreover, even if the prior
probability was .9, strongly presuming that he was the father, it
still does not conclusively establish, or presume or assume he had
intercourse with the woman. This is a matter for the jury based on
all the evidence in the case, which could include no access,
impotence, vasectomy and other similar matters.

 The Indiana Court of Appeals, over an objection that Bayes'
Theorem violated the presumption of innocence, expressly concluded
that the probability of paternity statistic was admissible in a
criminal trial. In Davis v. State, a husband and wife were
convicted of neglect of a dependant. Their baby was abandoned on
the side of a gravel road within hours of its birth. Using HLA
testing and Bayes' Theorem, the State showed that the Davis's were
the parents of the abandoned child. On appeal, the parents
contended that Bayes' Theorem violated the presumption of
innocence.

 In Davis, one element the State had to prove was that the
abandoned child belonged to the defendants. Using parentage tests,
the State was able to link the defendants to the child in order to
prove that they had committed the crime charged. In the case
before us, the State has also used parentage tests to link the
defendant with the crime charged. The issue in Davis was whether
Bayes' Theorem could be used in a criminal case to show parentage. 
The Indiana appellate court determined that the .5 probability
invoked in Bayes' Theorem was a neutral consideration and that the
probability of parentage statistic was admissible. Id. at 138.

 In this instance, we conclude that probability of parentage
statistic is admissible under Kelly v. State, supra, and that its
admissibility under Kelly does not violate the appellant's
presumption of innocence. Appellant's first point of error is
overruled.

Appellant's Second Point of Error


 In the alternative to his first point of error, appellant
claims in his second point that the trial court erred by admitting
the probability of paternity statistic because there was no
testimony regarding the mathematical applications of the test
results of the probability of paternity testing using Bayes'
Theorem. Under the point, appellant, in essence claims that as a
condition of admissibility, the State is required to call a
mathematical expert to comment on the possible interpretations of
the statistical evidence. We disagree. Rule 702 and Kelly make no
such requirement for the admission of the scientific evidence in
question.

 To support his position, appellant points out that where
Bayes' Theorem has been permitted, some courts require certain
precautionary conditions be met before allowing the evidence. 
Particularly, he points to Spann v. New Jersey, 617 A.2d at 264. 
While the New Jersey Supreme Court indicated that it might be
necessary to have expert testimony from a geneticist and a
mathematician in order to allow Bayes' Theorem evidence at trial,
we note that the court was reviewing admissibility of evidence
under its own state standard. As we have previously discussed
above, in Texas the admissibility of scientific evidence is
governed by Rule 702 of the Texas Rules of Evidence and the
standard laid out in Kelly. (8) Again, we are convinced that the
statistical evidence presented in this case satisfied that test.

 The record contains testimony from Dr. Eisenberg addressing
the relevance and reliability of the probability of paternity
statistic. In the hearing on the motion to suppress, he testified
about his extensive credentials and expertise in the field of
molecular biology as applied to genetic testing. He testified that
the methodologies employed in the DNA testing were standard,
including the statistical calculations that were used to interpret
the test results. Specifically, he testified that use of the .5
prior probability was standard in parentage testing, and that it
was a neutral factor since it did not "give any weight to either
side" on the issue of paternity. Dr. Eisenberg testified before
the jury that if the prior probability in the calculation were
reduced to .01 (1%), reflecting a very low assumption that
appellant was the father, the probability of paternity was still
"in excess of 99 percent." Finally, he testified that the tests
run in this case were run twice in order to verify the results and
rule out the possibility of errors. In light of this testimony,
the trial court was within its discretion to admit the probability
of paternity statistic under the Kelly test. (9)

 Even assuming arguendo that the probability of paternity
statistic was improperly admitted, we conclude that such error was
harmless. The defense had the opportunity to cross examine Dr.
Eisenberg on the use of the prior probability. By cross, the
defense pointed out to the jury the nature of the probability of
paternity statistic and how it could be misleading. The defense
did not question the other two statistics at all. Based on other
evidence that appellant had access to T.S., that he had opportunity
to be alone with her, that he knew she could not consent to sexual
intercourse, that appellant matched on all six regions of DNA loci
tested, that the test included him while excluding 99.99% of the
male population of his race, and that his paternity index made him
nearly 15,000 times more likely than the random man to be the
father of T.S.'s child, we conclude beyond a reasonable doubt that
the admission of the probability of paternity, even if error, made
no contribution to the conviction. (10) Appellant's second point of
error is overruled. 

Appellant's Third Point of Error


 In his third point of error, appellant claims the trial court
erred by overruling his motion to set aside the verdict and
judgment rendered against him and grant him a new trial because the
prosecution knowingly introduced inadmissible evidence clearly
calculated to inflame the minds of the jurors against him. We
disagree.

 The complained of statements came from Janice Robinson,
another state school employee. The State's attorney asked Robinson
if she was aware of a statement made by the appellant that the
female clients of the State School were "easy" or that they "wanted
sex." Robinson answered the question affirmatively before defense
counsel objected. Upon objection, the court held a hearing outside
the presence of the jury. The court denied the defense's motion
for mistrial based on prosecutorial misconduct, then sustained the
objection. The jury was brought back in, and the court ordered the
jury to disregard the question and the answer. In essence,
appellant contends that in offering the statement, the prosecution
committed prosecutorial misconduct which constitutes reversible
error. Again, we reiterate our disagreement.

 The decision to grant or deny a motion for new trial is within
the discretion of the trial court, and appellate courts will not
reverse such decisions absent an abuse of discretion. State v.
Gonzalez, 855 S.W.2d 692, 696 (Tex.Crim.App. 1993). Moreover,
error in asking an improper question or admitting improper
testimony may generally be cured by an instruction to disregard. 
Livingston v. State, 739 S.W.2d 311, 335 (Tex.Cr.App. 1987). An
exception to this rule exists where it appears that the question or
answer is clearly calculated to inflame the minds of the jurors and
is of such a character as to suggest the impossibility of
withdrawing the impression produced on their minds. Kemp v. State,
846 S.W.2d 289, 308 (Tex.Cr.App. 1992). The issue is whether the
jury was so affected by the question that they were unable to
disregard it as instructed. Huffman v. State, 746 S.W.2d 212, 218
(Tex.Cr.App. 1988).

 Even if we concluded the question was calculated to inflame
the minds of the jury, we cannot conclude that the question or
answer was of such a character as to suggest the impossibility of
withdrawing the impression produced on the jurors' minds. At
worst, the question placed before the jury the idea that the
appellant may have made some statement indicating he thought the
female clients at the state school were seductive or sexually
aggressive. There was nothing in the offered statement indicating
appellant actually had sexual intercourse with the female clients. 
The question and answer did not suggest that appellant had 
confessed guilt where the appellant was denying guilt at trial. 
See Ladd v. State, 629 S.W.2d 139 (Tex.App.--Dallas 1982, pet.
ref'd).

 Assuming without deciding that the evidence offered was
inadmissible, we conclude beyond a reasonable doubt that any error
was cured and otherwise rendered harmless by the trial court's
instruction to disregard. The trial court did not err in
overruling appellant's motion for new trial. Accordingly, we
overrule appellant's third point of error.


 In conclusion, we overrule appellant's three points of error
and affirm the judgment of the trial court.


 Carlton B. Dodson

 Justice


Quinn, J., concurring

Publish. Tex. R. App. 47.4.
1. "Although relevant, evidence may be excluded if its probative
value is substantially outweighed by the danger of unfair
prejudice, confusion of the issues, or misleading the jury, or by
considerations of undue delay, or needless presentation of
cumulative evidence." Tex. R. Evid. 403.
2. Although parentage testing based on DNA analysis has only
been on the scene since the mid to late 1980's, a number of
methods, including Human Leukocyte Antigen (HLA) tests, have been
previously employed in paternity matters. HLA testing invokes the
same statistical calculations, including the probability of
paternity and Bayes' Theorem. Dr. Eisenberg testified that in the
past several years, nearly a million paternity tests in the U.S.
were conducted using DNA or HLA methods, each using the .5 prior
probability calculation.
3. Ultimately, there was testimony before the jury that the use
of a .01 (1%) prior probability would still generate a probability
of paternity of over 99.3% in this case.
4. In Lagrone v. State, 942 S.W.2d 602, 608 (Tex.Cr.App. 1997),
the Court of Criminal Appeals mentioned Dr. Eisenberg's opinion on
the probability of paternity statistic without passing on the issue
before us. We note that the probability of paternity statistic has
been admitted in a number of jurisdictions in criminal trials prior
to this case. However, in those cases, the statistic was not
challenged as violating the presumption of innocence. See State v.
Foster, 949 S.W.2d 215, 217 (Mo.App.E.D. 1997); State v. Pierre,
606 So.2d 816, 817-20 (La.App. 3 Cir. 1992); People v. Taylor, 460
N.W.2d 582, 585 (Mich.App. 1990); Martinez v. State, 549 So.2d 694,
696-97 (Fla.App. 5 Dist. 1989); Holley v. State, 523 So.2d 688, 689
(Fla.App. 1 Dist. 1988); State v. Smith, 735 S.W.2d 831, 833-35
(Tenn.Cr.App. 1987); State v. Thompson, 503 A.2d 689, 690-93 (Me.
1986); Bridgeman v. Commonwealth, 351 S.E.2d 598, 602-03 (Va.App.
1986); People v. Alzoubi, 479 N.E.2d 1208, 1209 (Ill.App. 3 Dist.
1985).

5. We note that M.J.B. is a civil paternity case. The Wisconsin
Court allowed the probability of paternity statistic primarily due
to a state statute allowing such evidence in civil paternity cases. 
Nevertheless, the Hartman decision seems to depart from the
rationale in M.J.B. while relying on some of that case's language.
6. Likewise, a prior probability of 1 (or 100%) would assume
that no one else but the accused could have been the father.
7. This case involved Human Leukocyte Antigen (HLA) testing
rather than DNA testing, but Bayes' Theorem is used to calculate
probability of paternity in both tests.
8. At the time of trial, the Texas Rules of Criminal Evidence
and Texas Rules of Civil Evidence were still separate. As of March
1, 1998, these rules have been consolidated. While the new rules
technically do not apply to this matter, we note that the current
Rule 702 is identical to the old Rule 702 under the Criminal Rules.
9. Although we conclude that the statistical evidence was
properly admitted, it is worth noting that the statistics merely
reinforce the truly damning evidence in this case - the DNA test
itself. Eisenberg testified that only the biological father or his
identical twin would match the child's DNA at every site tested. 
Appellant himself testified that he did not have an identical twin. 
Eisenberg stated that based on the DNA test, it was his opinion
that appellant was the father of the child, barring a first order
relative (i.e. brothers or father) or an identical twin. As
between first order relatives, appellant was 64 times more likely
to be the father. Here, the test results speak for themselves. 
Appellant matched at all six genetic sites tested.
10. Appellant waived his right to remain silent, and took the
stand voluntarily. On cross, he conceded that there was a
"possibility" that he had time alone with T.S., he knew T.S. was
"very retarded" and she "probably" couldn't understand the nature
of sexual contact or activity, and that he could not explain why
the DNA test results came out as they did.